THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 18, 2025 at Knoxville

**STATE OF TENNESSEE v. LEONARD HARRISON BEARD, JR.**

**Appeal from the Circuit Court for Maury County**
**No. 29080        Stella Hargrove, Original Judge**
**J. Russell Parkes, Successor Judge**

_____

**No. M2024-00503-CCA-R3-CD**

_____

The Defendant, Leonard Harrison Beard, Jr., was convicted by a Maury County Circuit Court jury of two counts of attempted first degree murder, a Class A felony; reckless endangerment, a Class A misdemeanor; unlawful possession of a firearm by a convicted felon, a Class B felony; reckless endangerment involving a habitation, a Class C felony; vandalism valued at $2,500 or more but less than $10,000, a Class D felony; and employing a firearm during the commission of a dangerous felony, a Class C felony. *See* T.C.A. §§ 39-12-101 (2018) (criminal attempt); 39-13-202 (2018) (subsequently amended) (first degree murder); 39-13-103 (2018) (reckless endangerment); 39-17-1307 (2018) (felon in possession of a firearm); 39-14-408 (Supp. 2024) (vandalism); 39-14-105 (2018) (subsequently amended) (grading); 39-17-1324 (2018) (subsequently amended) (employing a firearm during the commission of a dangerous felony). The trial court imposed an effective fifty-year sentence. On appeal, the Defendant argues that the trial court erred by denying his motion for a new trial on the basis that he received the ineffective assistance of counsel. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JILL BARTEE AYERS, JJ., joined.

John S. Colley III (on appeal and motion for new trial), Columbia, Tennessee, for the appellant, Leonard Harrison Beard, Jr.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Senior Assistant Attorney General; Brent Cooper, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to October 4, 2020 shootings inside a mobile home park. The Defendant and his then-girlfriend and codefendant, Amanda Helena Rogers, were tried jointly for charges related to the shootings. The Defendant was charged with the attempted first degree murders of Justin Barnhill, Jerry Dwight Humphrey, and Toni Schreffler; unlawful possession of a firearm by a convicted felon; reckless endangerment stemming from shooting into an occupied home; vandalism of property valued at $2,500 or more but less than $10,000; possession of a firearm during the commission of a dangerous felony; and coercion of a witness. The jury convicted the Defendant of the lesser included offense of reckless endangerment in connection with the attempted first degree murder of Jerry Dwight Humphrey and acquitted the Defendant of the coercion of a witness charge. The jury convicted the Defendant as charged in the remaining counts in the indictment.

The trial facts were summarized by this court in the codefendant's appeal from the conviction proceedings:

> Kerry Wiley testified that in October 2020, he lived in a mobile home with his fiancée, Racquel Swauger, and their four children, ranging in ages from seven years to a few months old. His cousin, David, and Toni Schreffler lived in a nearby mobile home. Although the [codefendant] was married to Mr. Wiley's brother, they were separated, and the [codefendant] was in a relationship with the [Defendant] at the time of the offenses. The [codefendant] continued to visit Mr. Wiley's family at his home and check on his children.

> Mr. Wiley testified that on the night of October 4, 2020, he returned to his home from a grocery store and found Ms. Swauger, three of their children, and Justin Barnhill at the home. Mr. Wiley stated that Mr. Barnhill was "like a brother" to him but acknowledged that Mr. Barnhill was a "junkie," who was addicted to methamphetamine and heroin. Mr. Wiley stated that he previously had an addiction to methamphetamine and heroin but that he stopped using the drugs shortly before his oldest daughter was born in 2018. He acknowledged that in October 2020, he was smoking marijuana on a daily basis.

> Mr. Wiley testified that shortly after he returned home, the [codefendant] and the [Defendant] arrived and that everything was "fine" until the [Defendant] asked him whether he knew anyone who wanted to purchase heroin. Mr. Wiley then ordered the [codefendant] and the [Defendant] to leave. The [Defendant] and Mr. Barnhill stepped outside,

-2-

while the [codefendant] remained inside the home telling the children goodbye. Mr. Wiley stated that approximately one to two minutes later, while the [codefendant] was still inside the home, Mr. Wiley opened the front door and saw the [Defendant] pointing a gun at Mr. Barnhill. Mr. Barnhill struck the [Defendant] and "wrapped him up," and they "hit the ground" and began wrestling. Mr. Wiley said that he heard gunshots "maybe within five seconds" of Mr. Barnhill and the [Defendant's] hitting the ground and that Mr. Barnhill yelled, "He f***ing shot me, he f***ing shot me."

Mr. Wiley ran into his home to retrieve his children. Two of his children were in the bedroom in the back of the home with Ms. Swauger, and his seven-year-old son was sleeping in his bedroom located near the area of the shooting. Mr. Wiley testified that bullets were flying through the bedroom as he retrieved his son and that "glass and drywall dust started, like, flying over my face and hitting the floor. I just picked him up and ran." The following day, Mr. Wiley observed a bullet hole in the wall approximately one foot above the bed in which his son had been sleeping and bullet holes in the bedroom window. Mr. Wiley and Ms. Swauger ran with their children out through the backdoor and to Ms. Schreffler's home. Mr. Wiley stated that he did not know where the [codefendant] was while he was retrieving his son but that he heard the [codefendant] yelling, "stop it."

Mr. Wiley never saw the vehicle in which the [codefendant] and the [Defendant] arrived because the area was too dark. He stated that as he was fleeing, he saw a vehicle travel in the direction of Ms. Schreffler's home and then out of his view. Mr. Wiley remained inside Ms. Schreffler's home for a short period of time before leaving to search for Mr. Barnhill. Mr. Wiley and Jerry Dwight Humphrey searched the area for Mr. Barnhill, but they were unable to locate him. Mr. Wiley testified that as he was searching for Mr. Barnhill, he saw the vehicle that had traveled past Ms. Schreffler's home earlier return from "the way it went." The vehicle traveled down the driveway toward Ms. Schreffler's home, and Mr. Wiley heard gunshots and saw "the little rings of fires coming out of the car" from the passenger's side where the shots were being fired. He stated that the vehicle then "busted a U-turn," "turned around," and "took off." Mr. Wiley did not see the direction in which the car went as he ran back to Ms. Schreffler's home to check on his children.

The search for Mr. Barnhill resumed once the police arrived. Mr. Barnhill's mother arrived at the scene and yelled for Mr. Barnhill, who replied that he was "down here." Mr. Barnhill was located 50 to 75 yards inside a wooded area across from Mr. Wiley's home, and Mr. Wiley stated

-3-

that Mr. Barnhill sustained a gunshot wound below his knee. Mr. Barnhill was transported by ambulance to a hospital.

During cross-examination, Mr. Wiley testified that as the [Defendant] and Mr. Barnhill were on the ground, Mr. Humphrey came around the corner of the home and told everyone to "quiet the hell down." Following the initial gunshot when Mr. Barnhill announced that he had been shot, Mr. Humphrey began assisting Mr. Barnhill in attempting to retrieve the gun. Mr. Wiley stated that he heard nine or 10 additional shots as he was gathering his children. He said that the [codefendant] was still inside the home when the initial gunshot was fired and that the [codefendant] ran out of the home and yelled for the two men to stop as the additional gunshots were fired.

Toni Schreffler testified that on the evening of October 4, 2020, at approximately 9:00 or 9:30 p.m., she was outside walking her dog when she heard a gunshot, followed by screaming and three to five additional gunshots. Brandon Chunn, Mr. Humphrey, Mr. Wiley, and Ms. Swauger, along with their children, ran from Mr. Wiley's home to Ms. Schreffler's home. Mr. Wiley was "frantic" and announced that Mr. Barnhill had been shot. Ms. Schreffler described Mr. Barnhill as "an amazing person when he's sober, but when he's not, it's not pretty." She stated that Mr. Barnhill had substance abuse issues, that she had previously allowed him to stay with her for about two weeks as he attempted to become sober, and that she had to kick him out of her home.

Ms. Schreffler testified that she decided to go outside and search for Mr. Barnhill, but she was unable to locate him after searching for five to 10 minutes. She heard a vehicle and ran back to her home. The backdoor was locked, so she went to the front of her home and saw a black vehicle slowly traveling down her driveway and toward her home. She stated that the vehicle was similar to Mr. Barnhill's vehicle and that she yelled Mr. Barnhill's name several times, thinking that he was in the vehicle. The vehicle slowed to a "creep," and then the driver "hit the gas" and drove into Ms. Schreffler's yard. Ms. Schreffler stated that the vehicle "paused for a second" with its headlights on her and that a floodlight at her home illuminated the area, allowing her to see inside the vehicle. She said that the driver was female, that she was unable to make "a hundred percent" identification, and that when she later viewed photographs, "I was pretty sure it was her. I said it looked just like her." Ms. Schreffler stated that she was able to see the passenger's face, and she identified the passenger as the [Defendant].

-4-

Ms. Schreffler testified that she heard three gunshots coming from the passenger side of the vehicle and that she "froze," believing that she had been shot. She stated that at the time of the shooting, she was standing at the corner of her home near where her vehicle was parked. She said that the black car was "completely out of the driveway by the time they were shooting" and was in the grass. She did not recall running inside her home, but she recalled "hearing about three to five more shots" and "grabbing the baby off the couch and just hitting the floor and hiding behind my coffee table." She called 9-1-1 and reported the shooting, and she cooperated with the responding officers.

Ms. Schreffler testified that on the following day, she discovered multiple bullet holes in her vehicle. She took the vehicle to an automobile repair shop where she received an estimate of $3,500 to repair the vehicle. Following a subsequent accident on the interstate, she discovered additional damage where another bullet struck the area around the gas tank.

During cross-examination, Ms. Schreffler testified that Mr. Wiley, Ms. Swauger, their children, Bradley Chunn, and Brandon Mitchell were inside her home when the shooting outside her home occurred. Ms. Schreffler did not know the [codefendant] or the [Defendant] prior to the shooting. She said that the police officers did not show her a photographic array. Rather, Mr. Wiley showed her a photograph of the [Defendant] from Facebook, and she recognized the [Defendant] as the passenger in the vehicle.

Dwight Humphrey, the owner of the mobile home park, testified that on the night of October 4, 2020, he was investigating "a lot of ruckus" and discovered his nephew, Mr. Barnhill, fighting another man. Mr. Barnhill was on top of the man, and Mr. Humphrey heard people saying that "he's got a gun." Mr. Barnhill tried to hold the man's hands to keep him away from the gun, and Mr. Humphrey attempted to assist Mr. Barnhill. Mr. Humphrey stated that he could not see the gun because it was "pitch dark" outside. He said that he heard one or two gunshots, that a woman exited Mr. Wiley's home, that the man with whom Mr. Barnhill was fighting instructed the woman to "get the A.R., get the A.K," that the woman retrieved a taser from a dark-colored car, and that the taser "went off" when the woman was 10 to 15 feet away from Mr. Barnhill and the other man.

Mr. Humphrey testified that he told Mr. Barnhill to run and that they fled in opposite directions. Mr. Humphrey confirmed that he informed police officers that the man was still shooting as Mr. Humphrey and Mr. Barnhill

-5-

were fleeing. Mr. Humphrey stated that he saw a vehicle traveling away from the scene and that as he was searching for Mr. Barnhill, he saw the vehicle enter the driveway leading to Ms. Schreffler's home. Mr. Humphrey said that he heard gunshots coming from the area of Ms. Schreffler's home after which the vehicle turned around and exited Ms. Schreffler's driveway.

Mr. Humphrey testified that as he was standing in front of Mr. Wiley's home approximately 75 to 80 feet from the roadway and calling 9-1-1, the vehicle traveled past him at approximately 35 miles per hour. He stated that as the vehicle was passing, he saw "an arm" hanging out of the passenger side window and pointing a gun in his direction. An occupant of the vehicle shot five or six times toward Mr. Humphrey and Mr. Wiley's home and then fled the scene.

During cross-examination, Mr. Humphrey testified that as he was assisting Mr. Barnhill, he did not see the woman hit anyone with the taser. He stated that the woman was 10 to 15 feet away from Mr. Barnhill and agreed that the woman would have been unable to use the taser against Mr. Barnhill at that distance.

Justin Barnhill testified that he failed to attend a prior hearing in which he was subpoenaed to testify because he "didn't want to be known as a snitch." He confirmed that he also did not want to testify at trial. While he was in custody as a result of an arrest for driving under the influence, second offense, he was served with a material witness order, requiring that he remain in custody until he testified at trial. He acknowledged that he had a prior conviction for misdemeanor theft.

Mr. Barnhill testified that he had been addicted to heroin for four or five years and that on the night of October 4, 2020, he planned to purchase heroin from the [Defendant]. He stated that any communication with the [Defendant] regarding the purchase of heroin would have been through the [codefendant]. Mr. Barnhill said Mr. Wiley was unaware that the [Defendant] was at Mr. Wiley's home to sell drugs to Mr. Barnhill. When the [Defendant] mentioned the drugs, Mr. Wiley told him to leave. The [Defendant] and Mr. Barnhill walked outside while the [codefendant] remained inside Mr. Wiley's home. Mr. Barnhill stated that he intended to purchase drugs from the [Defendant] but that the [Defendant] was "heated" or "mad" at Mr. Wiley.

Mr. Barnhill testified that he did not recall what was said but that the [Defendant] pulled out his gun. Mr. Barnhill stated that he was unarmed and that he did not threaten or hit the [Defendant] before the [Defendant] produced the gun. Mr. Barnhill struck the [Defendant], who then fell and "racked" the gun. Mr. Barnhill fell on top of the [Defendant] and attempted to take the gun away from him. Mr. Barnhill stated that the [Defendant] fired the gun multiple times during the struggle and told him that "you're dead." Mr. Barnhill responded, "[N]ot if I kill you first." Mr. Barnhill believed Mr. Humphrey came to the area but explained that he was focused on taking the gun away from the [Defendant]. Mr. Barnhill testified that "[i]t just seemed like it all happened so fast" and that "[i]t was just shot after shot after shot."

Mr. Barnhill testified that the [codefendant] used a taser on him two or three times and that he released the [Defendant] once the [codefendant] used the taser on his neck. Mr. Barnhill heard the [Defendant] state, "[G]rab the gun," and Mr. Barnhill fled to a wooded area. He fell several times while fleeing, and once he hid at the bottom of a hill approximately 100 yards away, he discovered that he had been shot in his knee. He did not know whether he was shot before or after the [codefendant] used the taser on him.

Mr. Barnhill was transported by ambulance to a hospital where surgeons removed the bullet from his knee. He awoke to find his leg wrapped in bandages, and he left the hospital against medical advice because he did not want to be in a position where he would be required to testify at a trial. He affirmed that he had a scar on his leg as a result of the bullet wound.

During cross-examination, Mr. Barnhill agreed that the [Defendant] did not point the gun at him when the [Defendant] first produced the gun and that Mr. Barnhill struck the [Defendant] as soon as he produced the gun. Mr. Barnhill believed shots were fired before the [codefendant] exited the home. Once the [codefendant] exited the home, she went to her vehicle, retrieved the taser from her purse, and used the taser on Mr. Barnhill two or three times. Mr. Barnhill confirmed that he heard additional gunshots as he was fleeing. He stated that while hiding, he did not initially answer those who were calling for him because he did not know who was calling for him, and he was afraid.

Tina Chunn, Mr. Wiley's mother, testified that the [codefendant] was married to one of her other sons and that she had known the [Defendant] since he was a child. She stated that on October 4, 2020, at 10:05 p.m., she received a call from the [Defendant's] telephone number but that she did not answer it. At 10:29 p.m., she received a call from the [codefendant's] telephone number, and when she answered the call, she recognized the voice

of the caller as belonging to the [Defendant]. The [Defendant] told Ms. Chunn that "what happened at Kerry's house stays at Kerry's house" and that she could "let Kerry know that if there is any police involved or any problems, then there will be more problems." Ms. Chunn testified that she began cursing the [Defendant] and that the [Defendant] responded that "since I'm the mommy dearest I am and I want to protect everybody, then I could be took care of, too." Ms. Chunn read her statement to the police in which she reported that the [Defendant] called her from the [codefendant's] cellular telephone and stated, "You tell them at Kerry's that what happened is what it is . . . . [I]f any police is involved, I will start with kids, and since you're the bad-a\*\* mommy dearest, I will take you out, too, b\*\*\*\*."

Lieutenant Sam Voss with the Maury County Sheriff's Department assisted in processing the scene at Mr. Wiley's home. He located one unspent nine-millimeter round and four spent nine-millimeter shell casings in the area outside the home. He noted that another spent nine-millimeter shell casing was apparently later recovered, but he was not present when it was recovered. A reddish brown substance that was consistent with blood was on the front bumper of a white vehicle parked in the driveway and on the ground at the bottom of the steps to the home. Lieutenant Voss recovered a plastic baggie on the ground outside the home. The baggie contained two individual baggies, one of which contained 3.99 grams of cannabis and the other contained .69 grams of cannabis and methamphetamine. Lieutenant Voss identified two bullet holes in the front window toward the end of the home and a corresponding bullet hole in an interior wall of the home.

In January 2021, the [Defendant] was arrested in Williamson County after he wrecked a vehicle while fleeing from police officers. While searching the vehicle, officers recovered two "security-style lock boxes" in the back floorboard. Officers searched the lock boxes pursuant to a search warrant and discovered a Smith & Wesson nine-millimeter pistol that had one bullet in the chamber and seven bullets in the magazine, additional magazines, a plastic bag containing nine-millimeter bullets, a 12-gauge shotgun shell, a laser sight, and a holster that could hold a nine-millimeter pistol.

Special Agent Alex Brodhag, a firearms examiner with the Tennessee Bureau of Investigation, examined the nine-millimeter pistol recovered from the lock box and the nine-millimeter cartridge casings recovered at Mr. Wiley's residence and concluded that the cartridge casings were fired from the pistol. He stated that the unspent nine-millimeter round had extractor

markings indicating that the round had been extracted from a firearm but that the markings did not provide sufficient detail to link the round to the pistol.

*State v. Amanda Helena Rogers*, No. M2022-01328-CCA-R3-CD, 2023 WL 7276667, at *1-5 (Tenn. Crim. App. Nov. 3, 2023), *no perm. app. filed*. After a sentencing hearing, the trial court imposed an effective fifty-year sentence.

After the trial, subsequent counsel was appointed, and the Defendant filed a timely motion for a new trial in which he asserted, in relevant part, that trial counsel provided the ineffective assistance of counsel. [1] An amended motion for new trial was later filed, and it alleged that trial counsel provided ineffective assistance by (1) not sharing discovery with the Defendant, (2) not developing a defense strategy with the Defendant, (3) not preparing the Defendant to testify at the trial or to make an intelligent decision about whether to testify, (4) refusing to present an unidentified defense witness requested by the Defendant, (5) not responding to the Defendant's "numerous letters" requesting information, (6) only meeting with the Defendant once before the trial, and (7) not engaging in plea negotiations with the State.

At the motion hearing, Valerie Smith, the Defendant's mother, testified that in January 2022, the Defendant was incarcerated and that she communicated with trial counsel about the Defendant's case. She said that on January 7, 2022, at 10:48 a.m., she sent counsel a text message containing a "pretty brutal" photograph depicting the Defendant after the altercation in this case. The photograph, which was received as an exhibit, showed the Defendant with blood and contusions on his face, centering around his left eye, nose, and mouth. Ms. Smith stated that on January 7, 2022, she also sent trial counsel a text message containing two video recordings of Bradley Chunn discussing what transpired during the altercation. She said that although she knew of Mr. Chunn, she did not know him personally.

Ms. Smith testified that she did not meet with trial counsel in preparation for the trial and that she did not receive any communications from counsel after she sent the photograph and the video recordings to counsel.

---

[1] Typically, ineffective assistance of counsel claims are raised in a post-conviction case following the conclusion of the conviction proceedings. *See* T.C.A. §§ 40-30-101 to -122 (2018) (Post-Conviction Procedure Act). Occasionally, these claims are raised at the motion for new trial and in the appeal of the conviction proceedings, although this practice is "fraught with peril." *See State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992) (quoting *State v. Jimmy L. Sluder*, No. 1236, 1990 WL 26552, at *7 (Tenn. Crim. App. Mar. 14, 1990), *perm. app. denied* (Tenn. July 16, 1990)). In the present case, subsequent counsel was substituted after the trial. Subsequent counsel raised ineffective assistance of trial counsel allegations in the motion for a new trial, and the matter was fully litigated at the motion hearing.

The Defendant testified that he learned of trial counsel's appointment while he was in pretrial confinement. He said that during the two years counsel represented him before the trial, counsel sent two letters regarding changes to the trial date. The letters were received as an exhibit and reflect a May 18, 2021 letter advising the Defendant that trial was scheduled to begin on January 10, 2022, and a January 11, 2022 letter stating that the trial was scheduled for "February 28 – March 4, 23022 [sic]."[2] The Defendant said that he received no further communications from counsel and that he first reviewed the discovery materials one-and-one-half months after the trial. He said that eighteen days before the trial, counsel visited him while he was in confinement, that the meeting lasted forty minutes, and that prison records confirmed the meeting and the duration. The Defendant said that counsel read to him five witness statements, which were included in the discovery materials, and that counsel said the Defendant "had nothing to worry about" regarding the remaining discovery materials. The Defendant said counsel stated, "[T]heir stories wouldn't match up and that basically I didn't need the discovery."

The Defendant testified that during their meeting, he and trial counsel were separated by two-and-one-half-inch glass and that "[i]t was just basically hollering and hoping you hear through the glass." The Defendant said he could barely hear counsel reading the witness statements. The Defendant said that he asked counsel to leave the discovery materials with him, that counsel said the materials were counsel's personal copy, and that counsel said he would mail the materials when he returned to his office later that day. The Defendant said, though, he never received the materials before the trial. He said he wrote several letters asking counsel to provide him with the materials.

A handwritten letter, along with the mailing envelope, from the Defendant addressed to trial counsel was received as an exhibit. The letter was postmarked February 20, 2021. The letter states that on February 2, 2021, counsel was appointed to the Defendant's case. The Defendant requested to speak with counsel at counsel's earliest convenience and requested a copy of the discovery materials.

The Defendant identified a March 15, 2021 pro se motion for discovery he filed with the trial court. The motion reflects that although the Defendant had requested by letter the discovery materials from trial counsel, the Defendant had not received the materials. The Defendant requested that the trial court provide him with the materials.

The Defendant testified that he wrote to trial counsel requesting the discovery materials six times before filing the pro se motion. The Defendant said that counsel never responded to his letters and that he stopped attempting to communicate with counsel after he filed the pro se motion. The Defendant felt as though he was wasting his time with counsel. The Defendant said he was "extremely discouraged" because the trial court

---

[2] The record reflects that the trial was held between February 28, 2022, and March 4, 2022.

mailed him a copy of counsel's motion for discovery and advised him to obtain the materials from counsel.[3]

The Defendant testified that he had one court appearance via Zoom after he filed his pro se motion for discovery but before the trial. When asked if he mentioned to the trial court that he had not received the discovery materials, the Defendant said that he was not able to speak much and that he was told the charges had been amended.

The Defendant testified that after he was transported from the Tennessee Department of Correction to the jail for the trial, trial counsel was supposed to meet with him the weekend before the trial began but that counsel did not meet with him. The Defendant said counsel did not discuss trial preparation or whether he would testify. The Defendant said that between the time of their single meeting on February 10, 2022, and his transportation to the jail for the trial on February 26, 2022, he spoke to counsel by telephone four times. The Defendant said that during each conversation, he told counsel that he was not prepared for the trial and that he wanted counsel to request a continuance because the Defendant had not received and reviewed the discovery materials and because there was no trial strategy. The Defendant said that counsel told him the trial judge would decide whether to grant a continuance and that after jury selection, he told counsel that he wanted "an extension" on the trial date. The Defendant said that after jury selection was complete and the jurors left the courtroom for lunch, he told the trial court that he had not received the discovery materials, that he and counsel had not devised a trial strategy, and that he was not ready to proceed with the trial. The Defendant said the court denied the request for a continuance but told counsel that he had one-and-one-half hours to review the discovery materials, which included video recordings, with the Defendant and to prepare for the trial and that counsel was instructed not to leave the courtroom until the Defendant was prepared for the trial. The Defendant stated that he and counsel left the courtroom and entered a small room, that counsel opened two video recordings on counsel's computer, that counsel told him to watch the recordings, and that he did not see counsel again until the trial resumed. The Defendant said that he did not review the photographs until they were received as trial exhibits and that he never reviewed the witness statements, although counsel read them to him at their single meeting.

The Defendant testified that he and trial counsel never discussed a possible plea agreement but that during a break in the trial, he overheard the prosecutor tell counsel that she did not extend a plea offer because she did not think the defense would accept an offer.

---

[3] The record contains neither counsel's motion for discovery nor any correspondence from the trial court to the Defendant regarding the discovery materials.

The Defendant testified that counsel at the motion for a new trial hearing also represented him at the preliminary hearing and that the Defendant did not know if trial counsel was present for the preliminary hearing. The Defendant recalled that Mr. Barnhill testified at the preliminary hearing and that the Defendant asked trial counsel to "use that preliminary hearing" as trial evidence. The Defendant said, though, that he did not hear anything about the preliminary hearing evidence during the trial.

The Defendant identified the photograph of the Defendant's injuries previously received as an exhibit during Ms. Smith's testimony and testified that he took the photograph approximately thirty to forty minutes after the incident. The Defendant said the photograph was not introduced at the trial, although Mr. Barnhill inflicted the injuries depicted in the photograph. The Defendant said that everyone who was present during the incident, except for "Tony Shafferly," testified at the trial.[4] The Defendant said that he asked Ms. Smith to send the photograph to trial counsel in order for counsel to use it as trial evidence.

The Defendant reviewed the video recordings previously identified by Ms. Smith and testified that the recordings depicted Bradley Chunn, who was present at the scene, talking about the incident. The Defendant said that he told trial counsel about the recordings and that he asked his mother to send the recordings to counsel. The Defendant said that he asked counsel to subpoena Mr. Chunn as a defense witness, that Mr. Chunn was not a trial witness, and that counsel "didn't even try" to present Mr. Chunn as a witness. The Defendant said that he also requested counsel to present Kelly Roach as a defense witness but that counsel did not present any witnesses. The Defendant said that the photograph of his injuries was taken at Ms. Roach's home.

The Defendant testified that he and trial counsel did not discuss the possible sentence he might receive if convicted or the elements of the nine charged offenses. The Defendant said that the only time he and counsel discussed whether he would testify was during a five- to ten-minute conversation before the trial judge had asked counsel if the Defendant would testify. The Defendant said counsel believed the prosecutor would "pick [him] apart on the stand due to [his] previous felony record." The Defendant recalled that counsel and the codefendant's attorney decided after a discussion that if anyone testified, it should have been the codefendant because of the Defendant's previous felony record. When asked if he were a party to the discussion, the Defendant said that he "overheard" the conversation between the attorneys.

---

[4] The trial transcript reflects that Toni Schreffler testified at the trial and that she was the victim of one count of attempted first degree murder and of vandalism.

On cross-examination, the Defendant testified that he had previous convictions for "accessory after the fact," four counts of burglary, misdemeanor theft, and felony theft. He said that if he had testified at the trial, he would have told the jury that he was present during the incident, that he fired the gun, and that he left the scene with the gun. He said that he did not bring the weapon to the scene and that he did not go to the scene to sell heroin. The Defendant denied that he shot into the home but said that he could not "say nobody shot into a trailer." He said that shots were not fired into the home while he was present. He said that he left the scene with the codefendant, who drove the vehicle, and that he did not return to the mobile home park and fire a gun at or near Ms. Schreffler. He said he had been "in the vicinity of [Ms. Schreffler's] trailer," which was shared with Mr. Chunn.

The Defendant identified a photograph from Google Maps showing the mobile home park, which was received as an exhibit. The Defendant identified Mr. Wiley's home and testified that the incident with Mr. Barnhill began at Mr. Wiley's home. The Defendant, likewise, identified the home at which Ms. Schreffler lived and agreed that witnesses stated he went to her home. The Defendant said that Ms. Schreffler's home was the second location where his altercation with Mr. Barnhill "and the other assailants continued." The Defendant said he went to Ms. Roach's home after the altercation. He said that he wanted trial counsel to call Ms. Roach as a witness but that counsel did not present her during the defense's proof, although Ms. Roach attended the first day of the trial. He agreed that Ms. Roach was "thrown out" of the courtroom by the original trial judge for using a cell phone in the courtroom. The Defendant said that the judge asked Ms. Roach to put away her cell phone, that Ms. Roach explained to the judge that she "had to have her phone for business purposes," and that the judge asked Ms. Roach to leave. He did not recall if anyone other than the codefendant and Ms. Roach were around him on the night of the incident. The trial transcript and a recording of the preliminary hearing were received as exhibits.

Trial counsel testified that he had been licensed to practice law since 2000 and that he focused on criminal and divorce law. Counsel said that he was appointed to represent the Defendant twice, which was due to a superseding indictment, in November 2020 and in February 2021. Counsel said that sometime in 2021, "a couple of weeks" after being appointed, he sent a letter to the Defendant to inform the Defendant of counsel's appointment.

Trial counsel testified that he and the prosecutor discussed plea negotiations and that the prosecutor said "something to the effect of, it's gonna have to be 20 or 25 years in prison, something along those lines." Counsel said that the prosecutor never extended an official offer but that the discussion was "[b]asically, [the Defendant] was gonna have to plea to what he was charged with and serve the top end of the A for [the prosecutor] to even consider it."

Trial counsel testified that the Defendant was in pretrial confinement and that he was housed in various locations, including Franklin, Pikeville, and West Tennessee. Counsel said, though, that he met with the Defendant three or four times. Counsel said that he and the Defendant met sometime in early 2021 and that he had notes from the meeting. Counsel said that he talked to the Defendant by telephone ten to twelve times and that he went to West Tennessee to meet with the Defendant in early January near the time of the trial. Counsel recalled, though, that on one occasion, he was unable to visit the Defendant due to two or three inches of snowfall. Counsel said that around January 10, 2022, which was near the initial trial date, the Defendant was transported to the local jail and that he and the Defendant spoke at the courthouse.

Trial counsel testified that the initial January trial date was continued to March because the forensic testing on the firearm and the cartridge casings was not completed until late December or early January. Counsel recalled that the trial was rescheduled to March in order to pursue a motion to suppress, which the codefendant's attorney filed and counsel joined.[5] Counsel said that after the trial was rescheduled, he met with the Defendant "at the prison over there" for about two or three hours. Counsel said that the prison warden would not allow counsel to meet the Defendant the weekend before the trial began. Counsel said that his requests to speak to "the head person" at the prison were denied and that the Defendant was transported to the local jail on "that Monday . . . for trial." Referring to the week before the trial, counsel stated, "Obviously, [I] talked to him throughout the week. I offered to go see him that Monday or Tuesday night. I offered to go talk to him some more to get prepared for his trial and talk to him about his case." Counsel said the Defendant stated he "didn't think [counsel] needed to come see him that night."

Trial counsel testified that he brought his case file to the motion for a new trial hearing and that his file contained notes from a meeting with the Defendant. Counsel reviewed his notes, which were not dated and which were later received as an exhibit, and said the Defendant reported that the codefendant left her jacket at Mr. Wiley's home and that the codefendant was related to some of the people who lived at the mobile home park. Counsel said the Defendant stated that he returned to the scene and that "he got jumped basically." Counsel said that he and the Defendant also discussed Mr. Chunn, Mr. Barnhill, Mr. Humphrey, and the mobile home park. Counsel said that he and the Defendant discussed his girlfriend, Ms. Roach, who came to the trial and provided counsel with an unidentified photograph and a video recording of Mr. Chunn stating that Mr. Humphrey was the person who shot Mr. Barnhill. Counsel said that after he reviewed the recording, which he said he learned of in January 2022, he could not determine if Mr. Chunn was

---

[5] The joint motion to suppress contained in the record reflects that the trial was scheduled for January 10-12, 2022. The motion to suppress was denied on January 10, 2022, and the trial date was continued to February 28, 2022.

present during the incident. Referring to the recording, counsel said that a "girl" talked to Mr. Chunn, that she held the phone in a manner to prevent Mr. Chunn from knowing he was being recorded, that the girl asked Mr. Chunn about the incident, and that Mr. Chunn said, "We think Dwight shot Justin." Counsel stated that Mr. Chunn should have known who shot Mr. Barnhill if Mr. Chunn were present but that many people were present during "this melee," which occurred at night. Counsel recalled that Mr. Chunn also discussed the Defendant's shooting at Mr. Humphrey.

Trial counsel testified that Mr. Chunn's possible testimony that Mr. Humphrey shot Mr. Barnhill could have assisted the defense, in part, but that any testimony from Mr. Chunn that the Defendant shot at Mr. Humphrey could have harmed the defense because the Defendant was charged with the attempted first degree murder of Mr. Humphrey and with unlawful possession of a firearm by a convicted felon. Counsel said he and the codefendant's attorney each attempted to find Mr. Chunn. Counsel said that the codefendant was married to "one of the Wileys" who lived at the mobile home park, that the codefendant and her attorney "ask[ed] around" for Mr. Chunn's whereabouts, and that nobody was able to find Mr. Chunn before the trial. Counsel said, though, that after the jury began deliberations, the codefendant's attorney told counsel that the attorney had spoken to a member of Mr. Chunn's family, which counsel thought could have been Mr. Chunn's mother. Counsel said the family member told the codefendant's attorney that Mr. Chunn was incarcerated at the Williamson County Jail. Counsel said he could not reopen the proof after deliberations began.

Trial counsel testified that after reviewing the video recording, he concluded that Mr. Chunn had not incriminated himself in the incident because Mr. Chunn spoke about what he saw during the incident. Counsel said, though, he questioned whether Mr. Chunn was present during the incident.

Trial counsel testified that a woman, whose name he could not recall, had been present during the incident but was in a rehabilitation facility or in prison at the time of the trial, that he "couldn't really" subpoena her to testify, and that the substance of her potential testimony would have been inadmissible hearsay in that she overheard someone else talking about the incident.

Trial counsel testified that in February 2021, he received one letter from the Defendant requesting the discovery materials. Counsel said that the discovery materials were sent to Franklin per the Defendant's request but that the package was returned because the Defendant was moved to Pikeville. Counsel said that the materials were sent to Pikeville and that he also took the materials to their February 2022 in-person meeting to review before the trial. Counsel said that the prosecutor provided the defense with "some" video recordings close to trial and that he and the Defendant reviewed them during breaks on the first day of the trial. Counsel recalled that the recordings were from a home security

system at the mobile home park and depicted the locations of the people who were there. Counsel thought the recordings could have depicted "some shots."

Trial counsel testified that his defense strategy was to attempt to impeach the witnesses because "[t]heir stories were kind of all over the place." Counsel recalled that Mr. Wiley said he saw the Defendant "looking back towards the house pointing a gun" at the vehicle. Counsel recalled that the codefendant said she "jumped in with the [stun] gun to try to get -- then also [the Defendant]. You have Dwight Humphrey who didn't see that." Counsel recalled that Mr. Humphrey claimed he was "down there the whole time" and saw a gun but that other witnesses reported not seeing a gun. Counsel recalled that Mr. Barnhill reported that the Defendant displayed a gun "out of his waistband," which was inconsistent with Mr. Wiley's statement. Counsel recalled that all of the witness statements were inconsistent in connection with how "they" fought and whether Mr. Humphrey was on the ground during the incident. Counsel said the testimony was convoluted. Counsel recalled that Mr. Barnhill fled from the scene and hid in the woods until someone found him and that Mr. Barnhill did not want the Defendant to be prosecuted. Counsel said that he attempted to show that Mr. Barnhill was not "this nice peaceful person" by the tattoos on his knuckles, which counsel said showed "F--- you" and "Bring it."

Trial counsel testified that he and the codefendant's attorney discussed whether the codefendant would testify. Counsel thought it would have been better for the codefendant to testify because she had less legal exposure but said she chose not to testify. Counsel said that he had anticipated authenticating the photograph of the Defendant's injuries through the codefendant's testimony but that she declined to testify. Counsel said that Ms. Roach took the photograph of the Defendant's injuries and provided it to counsel, that she came to the trial, and that the original trial judge "called her down in the middle of the trial for her being on her phone." Counsel said that the judge believed Ms. Roach was "going in and out that door telling other people what was being testified and violating the Rule [of Sequestration]" and that the judge wanted to view Ms. Roach's cell phone. Counsel recalled that the judge "chewed her out kind of in front of the jury." Counsel said that Ms. Roach left the courtroom on the first day of the trial and did not return. Counsel said he questioned whether to present her as a defense witness after the incident with the judge and decided not to present her as a witness due to concern the incident would be relevant if she testified. Counsel said that Ms. Roach's potential testimony about the photograph probably would not have included testimony related to where the Defendant sustained the injuries due to a possible hearsay objection. Counsel said it was possible that her potential testimony could have satisfied the excited utterance hearsay exception. Counsel said that he considered presenting the Defendant as a witness to authenticate the photograph and that he and the Defendant discussed the dangers of cross-examination and the Defendant's previous felony convictions. Counsel said he told the Defendant that the prosecutor would question the Defendant about "going to Franklin and . . . running from the police and the

-16-

gun being found and it matching." Counsel noted that the prosecutor had twenty years' experience but said that the Defendant had the final decision about whether to testify. Counsel said he had hoped he "muddied the waters enough" at the trial by highlighting the inconsistent witness statements.

Trial counsel testified that the photograph showed bruises and injuries on the Defendant's face and that the trial evidence showed Mr. Barnhill struck the Defendant's face. Counsel recalled that Mr. Wiley testified that the Defendant pointed a gun at Mr. Barnhill, that Mr. Barnhill hit the Defendant's face, causing the Defendant to fall on the ground, and that Mr. Barnhill pinned down and beat the Defendant. Counsel recalled Mr. Barnhill's testimony that he and the Defendant fought and struggled on the ground. Counsel said that although testimony about the physical altercation was presented, the photograph showed the extent and the degree to which the Defendant was injured.

On cross-examination, trial counsel testified that at the preliminary hearing, Mr. Barnhill testified that the photograph of the Defendant showed the Defendant's injuries after Mr. Barnhill beat the Defendant. Counsel recalled that he listened to the preliminary hearing recording but said that his case file did not contain the recording. Counsel did not think he obtained a transcript of the recording. Counsel said Mr. Barnhill did not lie during his testimony. Counsel said he did not file a notice of self-defense. Counsel said that one of the Defendant's potential witnesses sat in the courtroom during jury selection but that counsel learned later the woman was Ms. Roach, who sent him the photograph of the Defendant's injuries and the recording of Mr. Chunn. Counsel said that although he never met Ms. Roach, he spoke to her by telephone about the photograph and recording. Counsel said that Ms. Roach was a potential defense witness, depending upon whether the Defendant or the codefendant testified. Counsel said that before the Defendant and the codefendant elected not to testify, Ms. Roach had already been admonished and asked to leave the courtroom by the original trial judge.

Trial counsel reviewed the text messages on his cell phone and testified that he was mistaken in his earlier testimony. Counsel said that the codefendant's attorney sent the photograph of the Defendant's injuries and the recording of Mr. Chunn to counsel on January 7, 2022, at 3:26 p.m. Counsel reviewed the photograph exhibit showing that Ms. Smith sent counsel a text message containing the photograph and the recording on January 7, 2022, at 10:48 a.m. After reviewing his text messages, counsel stated that he received the photograph from Ms. Smith at 10:48 a.m. and the recording at 11:11 a.m. Counsel agreed that he only received the evidence from Ms. Smith and the codefendant's attorney and that he had been mistaken about Ms. Roach's having sent the evidence.

Trial counsel testified that he spoke to Ms. Roach by telephone after he received her information. Counsel thought but was uncertain whether the Defendant provided Ms. Roach's information to counsel. Counsel thought he and Ms. Roach spoke a couple of

days before the snow event that prevented him from meeting with the Defendant in early January. Counsel said he understood that Ms. Roach photographed the Defendant immediately following the incident. When asked about "the downside" of presenting Ms. Roach as a defense witness, counsel said that none existed until the incident involving Ms. Roach, her cell phone, and the original trial judge. Counsel said the incident had been embarrassing to Ms. Roach. Counsel said, though, Ms. Roach agreed to come to the trial but that the judge made "allegations about her supposedly talking to -- conveying to people outside, that type of thing, texting people about the case." Counsel said that he decided she would not be a defense witness.

Trial counsel testified that he was unable to locate and interview Mr. Chunn before the trial. Counsel said that "we" attempted to find him, that the codefendant, who was married into the family, attempted to find Mr. Chunn, and that "we" spoke with Mr. Chunn's mother, who did not disclose Mr. Chunn's whereabouts. Counsel clarified that the codefendant's attorney conveyed the attorney's attempts to find Mr. Chunn. Counsel explained that after deliberations began, Mr. Chunn's mother disclosed to the codefendant's attorney that Mr. Chunn was in jail. Counsel agreed that the Defendant wanted a continuance but denied that the Defendant provided a reason. Counsel said that the inability to locate a material witness was a good reason for seeking a continuance but that "it could cut both ways," depending upon how the jury perceived Mr. Chunn's statements in the recording.

Trial counsel reviewed his case file and testified that he sent letters to the Defendant on May 6; January 11; and May 18, 2021. Counsel said that the May 6 letter was returned to his office and that he "got one" on February 8, 2022. Counsel said that he did not find a letter regarding discovery materials but that he was "pretty sure we mailed it" and that he took the materials with him when he met with the Defendant in January 2022. Counsel said he was "[p]retty sure" he left a copy of the materials with the Defendant at their meeting and that they met in an "open area" and were able to "exchange things." Counsel said they were not separated by glass. Counsel recalled that he read reports, talked about the witness statements, and discussed the case. Counsel said they met in-person twice.

Trial counsel testified that he and the Defendant met in-person in "January . . . and some time in [2021]." Counsel thought the 2021 meeting occurred at the courthouse and that his notes previously received as an exhibit were from this meeting. Counsel then said they met three times. He said that he and the Defendant spoke by telephone, as well, and that they would have discussed the Defendant's testifying at the trial. Counsel said that he offered to meet in-person at the jail Monday and Tuesday before the trial to discuss the Defendant's testifying, that the Defendant thought counsel did not need to come to the jail, and that counsel believed "at that point [the Defendant] made his decision that he didn't want to" testify.

Trial counsel testified that he did not recall if the Defendant accused counsel of not providing the Defendant with the discovery materials on the first day of the trial but that, during trial breaks, he and the Defendant reviewed new video recordings provided by the prosecutor. Counsel did not dispute that the trial transcript reflected that the original trial judge gave counsel and the Defendant one hour and fifteen minutes during a lunch break to review the recordings. Counsel recalled that he and the Defendant reviewed the recordings in the grand jury room.

Trial counsel testified that he and the Defendant discussed the possible sentences during a telephone conversation and during their in-person meeting. Counsel recalled that the Defendant wanted a three- to six-year sentence in this case to be served concurrently with a previous three- or four-year sentence. Counsel said he explained to the Defendant that the prosecutor was not going to extend an offer "anything like that." Counsel said he explained to the Defendant that the prosecutor might agree to a twenty- or twenty-five-year sentence. When asked about a twenty- to twenty-five-year plea offer, counsel could not recall when he conveyed it to the Defendant. Counsel said, though, that he would have conveyed the offer during a telephone call before the early January 2022 trial date and that the Defendant said he was not going to accept twenty to twenty-five years. Counsel said his case file did not contain notes about a possible plea offer. Counsel said his case file reflected that he went to West Tennessee to meet with the Defendant on February 18, 2022, which was ten days before the trial, and that the inclement weather prevented him from meeting with the Defendant on January 6.

Trial counsel testified that he received a copy of the Defendant's pro se motion for discovery. A March 16, 2021 email from the trial court clerk's office to "Amy" in counsel's office was received as an exhibit. The email reflects that a deputy trial court clerk forwarded the Defendant's "inmate letter" received by the trial court. Referring to the email, counsel said that the pro se motion was attached and that he made handwritten notes instructing his staff to "check with circuit and see if I got appointed. If so, copy file, file discovery." Counsel said that his staff notated on the email "already done" on March 17, 2021. Counsel said he did not know he had been appointed to the Defendant's case until his office received this email. When asked how counsel could have mailed the discovery materials to the Defendant before the March 16, 2021 email, counsel said the Defendant sent him a letter dated February 20, 2021, that his office mailed the discovery materials to the Defendant in Williamson County, that the package was returned, that his office located the Defendant in Pikeville, and that the materials were mailed to the Defendant in May.

When asked if "not admitting that photograph [of the Defendant's injuries had not been] . . . a strategic decision," counsel said, "No." Counsel said his plan was to admit the photograph through the testimony of the Defendant, the codefendant, or Ms. Roach. When asked if the photograph could have been admitted through Mr. Barnhill's testimony,

counsel said, "Yes." When asked if not presenting Ms. Roach as a defense witness was a strategic decision, counsel said he decided presenting her was going to "open a lot of can of worms" because the original trial judge questioned her about talking to witnesses and about her cell phone usage. Counsel said it "wasn't gonna look real good" to call her as a witness. Counsel agreed, though, that initially "not calling her was not part of [his] trial strategy."

Trial counsel testified that he considered presenting Mr. Chunn as a defense witness. Counsel said that Mr. Chunn's potential testimony that the Defendant fired a gun "didn't look good" but that Mr. Chunn "did place someone else shooting Mr. Barnhill, which obviously helped." Counsel said that he would have liked to present Mr. Chunn as a witness but that he could not find Mr. Chunn.

The two video recordings previously identified by Ms. Smith were received as an exhibit. In the first recording, a cell phone was visible, and a woman and a man were seen on the phone's screen. The man stated, "We all think Dwight accidently shot Justin." A portion of the recording was inaudible, and the woman stated, "For real?" The man stated that Justin had "Lenny's hands . . . pinned down with his knees" and that Justin told Dwight to "shoot him in the face." The man said that he then heard gunshots and that Justin ran from the scene. The woman asked, "So Lenny didn't shoot him," and the man responded, "No." The recording became inaudible for a short time again, and the man said a person, whose name was inaudible in the recording, shot at a trailer and at Dwight while Dwight walked through the yard.

In the second recording, the same man and woman were visible on a cell phone screen. The recording began abruptly and the woman asked why "Justin" was "doing all this?" The man responded that he did not know but that the incident involved heroin. The woman said that "he was still strung out," and the man responded, "Well, no s---."

On redirect examination, trial counsel referred to his notes from his in-person meeting with the Defendant. Counsel said that the Defendant stated that he returned to the scene to retrieve the codefendant's jacket but that, later in the meeting, the Defendant said he was going to trade heroin for a pistol. Counsel said that if the Defendant had testified, the defense would have admitted that the Defendant was trading heroin in exchange for a .40-caliber Smith and Wesson. Counsel recalled that the nine-millimeter handgun was found in a Nashville hotel at the time of the Defendant's arrest but that nine-millimeter cartridge casings were not found at the scene.[6] Counsel said that although two guns were mentioned during the police investigation, the Defendant was charged with employing the

---

[6] The firearms report contained in the record reflects that four nine-millimeter cartridge casings and one unfired nine-millimeter bullet were found at the scene.

.40-caliber handgun. Counsel agreed that he filed a motion regarding the variance in the indictment relative to the handguns. Counsel said that if the Defendant had testified that he possessed any firearm while being a convicted felon, the Defendant could have faced a federal prosecution.

Referring to his notes from their in-person meeting, trial counsel testified that the Defendant reported that Mr. Barnhill asked the Defendant about trading Mr. Barnhill's handgun in exchange for the Defendant's heroin. Counsel said that the Defendant and Mr. Barnhill agreed to the trade, that Mr. Barnhill left the scene to retrieve the handgun from Mr. Humphrey's home, and that the Defendant and the codefendant went inside Mr. Wiley's home. Counsel said the Defendant reported that Mr. Barnhill returned to Mr. Wiley's home, that Mr. Barnhill said Mr. Humphrey was on his way home, that the Defendant was going to drive Mr. Barnhill to Mr. Humphrey's home to wait, and that the Defendant was struck on the back of the head as he walked off the front porch of Mr. Wiley's home. Counsel said the Defendant reported that he and Mr. Barnhill began fighting and that "[a] few other people jump in on him and are kicking him and hitting him. [Mr. Barnhill] got him in a headlock. [The Defendant's] on his stomach on the ground." Counsel said the Defendant said that the codefendant came outside and used a taser on Mr. Barnhill to stop the assault, that everyone ran, that the Defendant and Mr. Barnhill ran into the woods, and that the Defendant was upset. Counsel said the Defendant stated that he possessed the gun, that he shot at three or four cars, and that he shot into Mr. Wiley's home.

Trial counsel testified that if the Defendant previously testified that he did not shoot at the home, this was inconsistent with what the Defendant told counsel. Counsel said the Defendant reported that after the shooting, the Defendant and the codefendant left. Counsel recalled that the .40-caliber pistol was "dropped" during the scuffle, that the Defendant claimed he possessed the nine-millimeter pistol, and that "they" possessed the .40-caliber pistol. The January 5, 2022 TBI firearms report, which was received as an exhibit, showed that four nine-millimeter cartridge casings and one unfired nine-millimeter bullet were recovered from the scene and that the cartridge casings were determined to have been fired from the nine-millimeter gun recovered in this case. The report does not reflect an analysis in connection with a .40-caliber handgun.

Trial counsel testified that his notes reflected his discussion with the Defendant about his previous criminal convictions, which included thefts, burglaries, and accessory after the fact. Counsel said the notes also reflected that the video recordings were of Mr. Chunn. Referring to home security recordings from Ms. Schreffler's home, counsel said that Mr. Chunn was seen entering the home. Counsel recalled that the car which sustained

gunshots was "a pretty good distance" from Ms. Schreffler and that the jury found the Defendant guilty of the lesser included offense of reckless endangerment.[7]

On recross-examination, trial counsel agreed that a potential twenty-year sentence for a federal firearm-related conviction was less than the Defendant's fifty-year sentence in this case. Counsel recalled that he and the Defendant discussed that, if the Defendant had testified, he would have admitted he had possessed a firearm and had been a convicted felon. Counsel did not recall if he and the Defendant specifically discussed a possible federal prosecution. Counsel noted that the Defendant would have also admitted to an attempt or a conspiracy to sell heroin in exchange for a firearm.

Referring to prison visitation documentation from West Tennessee State Penitentiary, which was received as an exhibit, trial counsel testified that on February 18, 2022, he met with the Defendant. The records reflect that counsel signed the prison visitation logbook at 11:20 a.m. and that counsel signed out at 1:00 p.m. Counsel said that he first saw the Defendant approximately five to ten minutes after signing the logbook. Counsel said that he and the Defendant talked through a glass partition, that he showed the Defendant the documents he had in his file, and that he "dropped some off" for the Defendant after the meeting. Counsel said that this case did not contain a lot of paper discovery and that he brought his computer to the meeting to show the Defendant the video discovery. Counsel said their meeting lasted about one hour and thirty minutes. Counsel said that he and the Defendant discussed everything about the case, that they met twice, and that they talked by telephone at various times.

Trial counsel testified that he knew the facts of the case, that he and the Defendant discussed the evidence, that the case was difficult, and that the prosecutor would not extend any plea offer "other than a very, very lengthy offer that [the Defendant] was not going to take." Counsel said the prosecutor would not have agreed to a short sentence. Counsel did not think he "could have done anything else or would have done anything different by meeting more with the Defendant.

_____

[7] The record reflects that the Defendant was convicted of the attempted first degree murder of Ms. Schreffler and of reckless endangerment of Mr. Humphrey as a lesser included offense of attempted first degree murder.

In its written order denying relief, the trial court noted that the indictment was returned on July 21, 2021, that trial counsel was appointed on September 22, 2021,[8] and that the trial concluded on March 4, 2022. The court noted the Defendant's ineffective assistance issues stemmed from counsel's alleged (1) failure to share the discovery materials, (2) failure to develop a defense strategy, (3) failure to prepare him to make an "intelligent decision" about whether to testify at the trial, (4) refusal to present defense witnesses, (5) failure to respond to his letters requesting information, (6) failure to meet with him more than once before the trial, and (7) failure to engage in plea negotiations.

The trial court found that trial counsel and the prosecutor discussed the potential for a plea agreement but that due to the Defendant's previous criminal convictions, the prosecutor never extended a "firm plea offer" because any potential agreement would have involved twenty to twenty-five years. The court found that the Defendant "never specifically authorized any settlement offer to be made" by counsel to the prosecutor and that the Defendant was not interested in any plea offer involving a sentence of twenty to twenty-five years. The court determined that counsel did not provide deficient performance in connection with plea negotiations and that even if counsel had been deficient, the Defendant failed to establish any prejudice.

The trial court collectively addressed the Defendant's remaining ineffective assistance allegations. The court found that the Defendant insisted he had never received the discovery materials and that trial counsel "believed" he shared the information in the materials with the Defendant. The court found that counsel "initially forwarded the discovery materials to the Defendant" at the Williamson County Jail but that "there appeared to be a letter" in counsel's case file showing "that those records and/or discovery may have been returned" to counsel. The court found that counsel believed he provided the Defendant with the materials when counsel visited him at the prison in West Tennessee and that they met for three to four hours. The court found, though, based upon the prison visitation records that counsel met with the Defendant for one hour and forty minutes. The court found that "no transmittal letters" showed that counsel "ever transmitted all of the discovery materials to the Defendant."

---

[8] The appellate record does not contain the appointment order. Trial counsel testified that he was appointed twice in this case because of a superseding indictment. Counsel testified that he was appointed in November 2020 and in February 2021, although he also testified that he did not know he had been appointed until his office received the March 2021 email from the trial court clerk's office. The only indictment contained in the record reflects a filing date of July 21, 2021. The Defendant's letter, which was postmarked on February 20, 2021, requested the discovery materials from counsel. The March 16, 2021 email from the trial court clerk's office to trial counsel's office transmitted the Defendant's March 15, 2021 pro se filing for discovery materials. As a result, the record contains evidence that counsel was appointed months before September 22, 2021.

The trial court reviewed the trial transcript in connection with the colloquy between the Defendant, trial counsel, and the original trial judge relative to the discovery materials. The court found that on the first day of the trial, the Defendant told the judge that he had never received the discovery materials. Relying on the transcript, the court found that the judge stated that counsel and the Defendant had an hour and fifteen minutes to review the materials and that counsel "would not go to lunch." The court found that when the judge questioned counsel about the discovery materials, counsel told the judge that the Defendant had seen the materials, that they had reviewed the materials, but that the Defendant had not seen the video recordings "[b]ecause they won't let me take my computer into prison to watch it with him." The court found that after "additional discussion," the judge treated the Defendant's request as a motion to continue. The court found that the judge stated the trial had been previously continued and that the judge assumed the parties were ready for trial at the previous trial date. The court found that the judge stated, as well, that "we have these last minute issues that should never occur with a second setting." Based upon this review, the court found "that the more credible evidence is that trial counsel did in fact go over much of the discovery with the Defendant but never furnished to him a copy of the videos which were provided during discovery nor did defense counsel provide to the Defendant a written copy of any of the statements or other discovery provided."

The trial court found that trial counsel and the Defendant provided inconsistent testimony regarding the number of times they met to prepare for the trial. The court found that although counsel testified that they met three or four times, the Defendant testified that they met for one "initial meeting which was short in duration and then for approximately" thirty to forty minutes at the prison. The court found "the more credible proof" was that counsel "only met with the Defendant for at best three . . . to four . . . hours total in preparation for the trial." The court noted that the Defendant received a fifty-year sentence and determined that counsel's "trial preparation fell outside the range of professionally competent assistance." The court noted that the trial occurred during the Covid-19 pandemic and found that although the original trial judge construed the Defendant's discovery complaints as a motion for a continuance, counsel "never formally moved for a continuance." The court found that if counsel were unable to meet with the Defendant due to the Covid-19 "lockdowns and/or other issues," and had an inadequate amount of time to prepare the Defendant for the trial, counsel "had an obligation to bring that to the Court's attention and move for a continuance." The court declined to "speculate" about what the original trial judge's ruling would have been if counsel had filed a formal motion to continue.

Regarding trial counsel's failure to call defense witnesses, the trial court found that counsel and the codefendant's attorney attempted to "locate the alleged witness, who might point the finger at another individual." The court stated that it "had serious reservations as to whether this witness could offer admissible testimony on any particular subject." The court found that at the motion hearing, the Defendant presented "witnesses" who had sent

-24-

counsel "photographs and/or videos which <u>could</u> have been used at trial." The court found that the photograph of the Defendant showed "significant lacerations, bruising, and/or bleeding" on his face. The court found that the Defendant wanted counsel to develop a self-defense strategy and to "introduce those photographs through witnesses which were produced at trial." The court found, based upon the trial transcript and Ms. Smith's testimony at the motion hearing, that counsel received a video recording of Mr. Chunn and the photograph of the Defendant's injuries following the incident in this case. The court found that Mr. Chunn did not testify at the motion hearing and that, as a result, the court could not speculate about the substance of Mr. Chunn's possible testimony or whether any testimony would have been consistent with the recording. The court determined that counsel did not provide deficient performance by failing "to secure" Mr. Chunn as a defense witness and that the Defendant failed to establish any prejudice.

In connection with trial counsel's failure to call "another person" as a defense witness, the trial court found that during the trial, "that witness was excluded from the [c]ourtroom by [the original trial judge]." The court found that the "potential witness," whom the court did not identify, was excluded from the courtroom because "she was using her cell phone," that the exchange between the woman and the original trial judge occurred in front of the jury, and that trial counsel made a strategic decision not to call "the very person who had been chastised" by the judge. The court determined that counsel's failure to present the witness did not constitute deficient performance.

The trial court determined, generally, that "even if the areas where trial counsel may have been deficient or ineffective, the Defendant has failed to carry his burden . . . that any deficiencies resulted in the Defendant being prejudiced to such a degree that the result of the proceedings would have been different."

Therefore, the trial court denied the motion for a new trial. This appeal followed. On April 22, 2025, the panel remanded this case to the trial court for the entry of an amended order setting forth the necessary findings of fact and conclusions of law for each of the Defendant's ineffective assistance allegations. *See State v. Leonard Harrison Beard, Jr.*, No. M2024-00503-CCA-R3-CD (Tenn. Crim. App. Apr. 21, 2025) (order); *see also* Tenn. Sup. Ct. R. 28 § 9(A); *Tate v. State*, 679 S.W.3d 631, 632 (Tenn. 2023). The trial court entered a supplemental order on July 3, 2025.

In the supplemental order, the trial court found in connection with the discovery materials that, although the materials were not provided to the Defendant, trial counsel reviewed and discussed the materials with the Defendant. The court found that although counsel was not permitted to provide the materials to the Defendant and to review the recordings with the Defendant at the jail or the prison due to the Covid-19 pandemic restrictions, counsel and the Defendant reviewed and discussed the recordings before the trial. The court found that the original trial judge allowed counsel and the Defendant to

review the recordings before the trial proof commenced. The court determined that counsel did not provide deficient performance with regard to the discovery materials and that the Defendant failed to establish any prejudice based upon the overwhelming proof of the Defendant's guilt.

Relative to trial counsel's failure to present Mr. Chunn as a defense witness, the trial court found that the Defendant failed to present Mr. Chunn as a witness at the motion for a new trial hearing. The court declined to speculate about Mr. Chunn's potential testimony and determined, as a result, that the Defendant failed to establish his ineffective assistance claim. Similarly, the trial court found that the Defendant failed to present the witness who was chastised and excluded from the courtroom during the trial by the original trial judge.[9] The court found that trial counsel made a strategic decision not to present the witness at the trial. The court determined that counsel did not provide deficient performance and that the Defendant failed to establish any prejudice based upon the overwhelming proof of the Defendant's guilt.

Relative to the trial court's previous determination that trial counsel provided deficient performance in connection with trial preparation, the court determined that the Defendant failed to establish any prejudice. After reviewing the trial evidence, including the ballistics expert's testimony establishing a "match" between the cartridge casings at the scene and the firearm possessed by the Defendant and the testimony of many witnesses who identified the Defendant as the shooter, the court found that the evidence of the Defendant's guilt was overwhelming. The court determined, as a result, that the Defendant failed to establish any prejudice resulting from counsel's deficient performance.

Relative to trial counsel's failure to present the photograph evidence of the Defendant's injuries, the trial court found that the photograph supported the State's evidence that the Defendant was struck by Mr. Barnhill during the altercation when the Defendant attempted to sell heroin. The court found that trial counsel's failure to present the photograph as evidence was a strategic decision and determined that counsel did not provide deficient performance. The court determined that even if counsel provided deficient performance, the Defendant failed to establish any prejudice.

Relative to trial counsel's failure to devise a defense strategy, the trial court determined that counsel did not provide deficient performance "because there was not a plausible defense strategy." The court stated as follows:

_____

[9] Although the trial court did not identify the witness, the record reflects that Ms. Roach was the potential defense witness at issue.

-26-

I suppose the Court is left to posit that this "defense strategy" was either, the State's witnesses aren't credible and the Defendant wasn't there, or the Defendant was there and got into a fight with [Mr.] Barnhill and the fight was so bad that the Defendant had to result to firearms to defend himself. Such a defense strategy in the face of multiple witnesses identifying the Defendant as having been there, or that the fight was so bad that the Defendant resorted to the use of firearms, (firearms which a ballistics' [sic] expert specifically matched to the Defendant's gun) is such that no jury would believe same.

The trial court found that the defense would have been required to present the Defendant as a trial witness to testify that he engaged in self-defense or was not present during the offenses and that either defense strategy would have subjected the Defendant to questions about his previous felony criminal history. The court determined that counsel did not provide deficient performance in this regard.

In connection with trial counsel's failure to prepare the Defendant to make an intelligent decision about whether to testify, the trial court determined that during the *Momon* hearing at the trial, the Defendant stated that he and counsel had sufficient time to discuss the Defendant's decision.[10] The court found, as well, that counsel testified that allowing the Defendant to testify would have subjected him to cross-examination by a seasoned prosecutor and would have resulted in evidence of the Defendant's previous criminal history. The court credited counsel's testimony regarding his and the Defendant's discussions about whether the Defendant should testify. The court found that the "more credible proof" was the Defendant and counsel had adequate discussions and that the Defendant decided not to testify. The court determined that counsel did not provide deficient performance and that the Defendant failed to establish any prejudice.

In connection with trial counsel's failure to respond to the Defendant's letters, the trial court determined that counsel did not provide deficient performance. The court found that although counsel did not respond in writing to the Defendant's letters, counsel and the Defendant met on multiple occasions when the Defendant was "transported for purposes of various [c]ourt appearances." The court determined, as a result, the Defendant failed to establish any prejudice.

Against this backdrop, we turn to the ineffective assistance allegations raised on appeal.

---

[10] *See Momon v. State*, 18 S.W.3d 152, 162 (Tenn. 1999) (outlining the procedure by which trial courts should follow to ensure that a criminal defendant knowingly, voluntarily, and intelligently waives his or her right to testify at a trial).

The Defendant contends that the trial court erred by denying his motion for a new trial because he received the ineffective assistance of trial counsel. In his brief, the Defendant asserts, generally, that counsel provided

> continuous, consistently sub-standard display of complete indifference . . . to his defense [and] . . . utilized none of the evidence or witnesses [the Defendant] requested; instead he put on no proof whatsoever. He claimed to have possessed a recording of the preliminary hearing but did not use it at trial for cross-examination. He didn't communicate with [the Defendant] in any meaningful fashion.

Beyond this general argument, which only contains citations to the trial court's order denying relief, to the standard of appellate review, and to the legal standard for establishing an ineffective assistance claim pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), the Defendant focuses on the trial court's determination that counsel provided, at least in part, deficient performance. The Defendant argues, though, that the trial court erred by denying relief because he established prejudice by clear and convincing evidence, but he does not explain the factual basis for his argument. The State responds that the Defendant has waived appellate review due to inadequate briefing and, alternatively, that the trial court did not err by denying relief on his ineffective assistance allegations. The Defendant has not responded to the State's waiver argument in a reply brief. *See* T.R.A.P. 27(c).

Tennessee Rule of Appellate Procedure 27(a)(7)(A) requires that an appellant's argument contain "citations to the authorities and appropriate references to the record . . . relied on." The rules of this court provide, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived[.]" Tenn. Ct. Crim. App. R. 10(b). The Defendant's brief fails to comply with the mandate of the Rules of Tennessee Court of Criminal Appeals and with the Tennessee Rules of Appellate Procedure. We caution counsel that appellate review is frustrated by the failure to identify the basis in the record for the argument presented, that compliance with the Rules of Appellate Procedure is expected, and that noncompliance may result in waiver of appellate review. However, notwithstanding the deficiencies in the Defendant's brief, we elect to consider whether the trial court erred by denying relief on his ineffective assistance of counsel claims.

Although the Defendant has raised his ineffective assistance of counsel claims in a motion for a new trial, ineffective assistance claims are generally raised in a petition for post-conviction relief, which we have previously noted. Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2018). A defendant has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2018). A trial court's findings of

-28-

fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A trial court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a defendant has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A defendant must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a defendant must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The trial court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A defendant "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## 1. Trial Counsel's Alleged Failures to Respond to the Defendant's Letters Requesting the Discovery Materials and to Share the Discovery Materials with the Defendant

The Defendant argues that the trial court erred by denying relief on his ineffective assistance claim that trial counsel failed to respond to his letters requesting the discovery materials and that counsel failed to share the discovery materials. The Defendant and counsel provided inconsistent testimony about their communications and about the

discovery materials. The Defendant testified that he sent counsel six letters requesting the discovery materials, to no avail. The record contains a February 20, 2021 letter in which the Defendant requested the discovery materials from counsel and a March 15, 2021 pro se motion for discovery, which counsel said he received on March 16, 2021. Counsel testified that he received the Defendant's February 20, 2021 letter and that his office mailed the materials to Franklin where the Defendant was being confined but that the materials were returned. Counsel said that his office sent the materials to Pikeville after the Defendant was moved and that he was "pretty sure" he provided the Defendant with a copy of the materials at their in-person meeting at the prison. We note, though, counsel's testimony that he did not know he had been appointed to the Defendant's case until he received the pro se motion for discovery from the trial court clerk's office. Counsel's case file did not contain a transmittal letter to the Defendant regarding discovery materials. Based upon this evidence, the trial court credited the Defendant's testimony that counsel did not respond to the Defendant's letters requesting the discovery materials and that counsel did not provide the materials to the Defendant. The trial court's credibility determinations are binding on appeal "unless the evidence in the record preponderates against those findings." *Henley*, 960 S.W.2d at 578; *see Fields*, 40 S.W.3d at 456-57. Given the inconsistent testimony between the Defendant and trial counsel, we conclude that the record does not preponderate against the court's credibility determination in this regard.

Regarding whether trial counsel and the Defendant reviewed and discussed the discovery materials, however, the trial court determined that counsel was not permitted to provide the materials to the Defendant and to review the recordings with the Defendant at the jail or the prison because of the Covid-19 pandemic restrictions. However, the record does not contain evidence that the pandemic prevented counsel from providing or reviewing the discovery materials, including the written documents and video recordings, with the Defendant. In fact, counsel did not testify that he met with the Defendant at the jail at any time during his representation, and the pandemic was never mentioned at the trial or at the evidentiary hearing.

Trial counsel testified at the evidentiary hearing relative to the in-person prison meeting that he and the Defendant discussed the witnesses' statements and that he showed the Defendant the documents he had in his case file. Counsel testified that this case did not contain much paper discovery and that he brought his computer to the prison to show the Defendant the video discovery. We note, though, that counsel's testimony at the evidentiary hearing on this point conflicts with the trial transcript in connection with what counsel told the original trial judge when the Defendant requested a continuance after jury selection was complete based upon his never receiving the discovery materials and not having had time to review the materials.

-30-

The trial transcript reflects that after the Defendant voiced his complaint about the discovery materials, the original trial judge asked counsel if the Defendant had seen the discovery materials. Counsel stated that he had reviewed the materials with the Defendant but that the Defendant had not reviewed the video recordings "because they won't let me take my computer into the prison to watch it with him." Counsel stated that he had met with the Defendant and that they had reviewed all of the witness statements. Counsel said he went to the prison the previous day but that the Defendant had been transported to the jail for the trial. Counsel said that the Defendant needed to review the "[o]fficer video" recordings from the scene. The judge treated the Defendant's request as a motion to continue, denied the motion, and told the Defendant and counsel to review the recordings during the lunch recess and, if necessary, after the trial adjourned for the day. To further complicate the matter, counsel testified at the evidentiary hearing that, near the time of the trial, the prosecutor provided video recordings obtained from a home security system at the mobile home park and that he and the Defendant reviewed the home security recordings during breaks on the first day of the trial. As a result, we conclude that the record preponderates against the trial court's finding that the Covid-19 pandemic prevented counsel from sharing the discovery materials with the Defendant.

In any event, the trial court found that although the discovery materials were not provided to the Defendant, trial counsel and the Defendant reviewed all of the materials before the trial proof commenced. Minimally, the record reflects that counsel and the Defendant met at least twice and spoke by telephone numerous times. Although the Defendant might not have reviewed any of the relevant video recordings during these meetings, counsel reviewed the discovery documents contained in the case file with the Defendant during the meeting at the prison. Counsel said that during the prison meeting, he read the reports and the witness statements to the Defendant and that they discussed the case. Counsel's notes from his meeting with the Defendant at the courthouse reflect that they discussed the Defendant's version of the events and his previous criminal history. Counsel testified that he and the Defendant discussed other aspects of the case during telephone conversations, including whether the Defendant should testify and possible sentencing outcomes. It appears from the record that the Defendant reviewed the video recordings during a lunch recess after the completion of jury selection but before the proof commenced, as instructed by the original trial judge. However, the evidence of the Defendant's guilt was overwhelming. Multiple witnesses identified the Defendant as the shooter, and, at the time of his arrest, the Defendant possessed the firearm used during the shootings. The Defendant possessed a nine-millimeter handgun, and the ballistics firearm report reflected that the cartridge casings found at the scene were fired from the gun obtained from the Defendant. As a result, we conclude that the record does not preponderate against the trial court's determination that the Defendant failed to establish counsel provided deficient performance resulting in prejudice. The Defendant is not entitled to relief on this basis.

## 2.      Trial Counsel's Alleged Failure to Develop a Defense Strategy

The Defendant asserts that the trial court erred by denying relief on his ineffective assistance of counsel claim that trial counsel failed to develop a defense strategy, which he argues encompassed a potential self-defense theory based upon the photograph evidence of the Defendant's injuries.  The trial court determined that counsel did not provide deficient performance "because there was not a plausible defense strategy."  However, counsel testified that his strategy was to attempt to impeach the witnesses due to inconsistencies in the testimony.  Counsel recalled that the witnesses' statements "were kind of all over the place."  Counsel testified that Mr. Wiley said he saw the Defendant "looking back towards the house pointing a gun" at the vehicle and that the codefendant said she "jumped in" with a taser to help free the Defendant during the altercation with Mr. Barnhill.  Counsel said Mr. Humphrey did not see the codefendant use the taser on Mr. Barnhill, who said the taser was used on him.  Counsel recalled that Mr. Humphrey claimed he was "down there the whole time" and saw a gun but that other witnesses reported not seeing a gun.  Counsel recalled that Mr. Barnhill reported that the Defendant displayed a gun "out of his waistband," which was inconsistent with Mr. Wiley's statement.  Counsel recalled that all of the witnesses' statements were inconsistent in connection with how "they" fought and whether Mr. Humphrey was on the ground "in the melee."  Counsel said that the testimony was convoluted and that he hoped he had "muddied the water" enough by highlighting the inconsistencies of the witness testimony.

Trial counsel testified that he did not file a notice of self-defense.  Counsel was not questioned about whether he considered but rejected self-defense as a possible theory.  This court will not speculate about the nature of any witness testimony that was not presented at the evidentiary hearing.  *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).  Further, although the photograph of the Defendant's injuries was not presented as trial evidence, the trial transcript reflects that evidence was presented to the jury about the physical altercation between the Defendant and Mr. Barnhill before the shooting began.  Mr. Wiley testified that Mr. Barnhill struck the Defendant, which caused the Defendant to fall on the ground, that Mr. Barnhill "wrapped him up," and that the men wrestled on the ground.  Mr. Barnhill testified that he struck the Defendant, that he fell on top of the Defendant, that they struggled, and that he attempted to take away the Defendant's gun.  Mr. Humphrey testified that Mr. Barnhill and the Defendant fought outside, which caused "a lot of ruckus," and that Mr. Barnhill attempted to hold the Defendant's hands in an effort to prevent the Defendant from shooting the gun.

As the trial court determined, a self-defense theory would have necessitated the Defendant's testimony, which would have permitted the prosecution to cross-examine the Defendant regarding his previous criminal history, and the Defendant would have been required to explain his fleeing the scene and the county after the offenses and his being found in possession of the firearm that was used during the shootings.  Additionally, if the

Defendant had testified, the defense would have likely had to admit that the Defendant was selling heroin, or trading heroin in exchange for a gun, when he was a convicted felon. Mr. Barnhill testified at the trial that he intended to purchase heroin from the Defendant. Given the inconsistencies in the witness testimony, counsel's strategy was not unreasonable, and we note that the Defendant was convicted of reckless endangerment as a lesser included offense of attempted first degree murder of Mr. Humphrey and was acquitted of the coercion of a witness charge. As a result, the record does not preponderate against the trial court's determination that the Defendant failed to establish counsel provided deficient performance resulting in prejudice. The Defendant is not entitled to relief on this basis.

### 3. Trial Counsel's Alleged Failure to Prepare the Defendant to Testify or to Prepare Him to Make an Intelligent Decision about Whether to Testify

The Defendant asserts that the trial court erred by denying relief on his ineffective assistance of counsel claim that trial counsel failed to prepare him to testify or to prepare him to make an intelligent decision about whether to testify. The Defendant testified that he and counsel only discussed whether he should testify at the trial during a five- to ten-minute conversation before the original trial judge asked if the Defendant would testify. The Defendant recalled that counsel believed the prosecutor would "pick [him] apart on the stand due to [his] previous felony record," which included convictions for four counts of burglary, misdemeanor and felony theft, and accessory after the fact. Counsel's credited testimony in this regard reflects that he and the Defendant discussed whether the Defendant should testify and the dangers of cross-examination, including the Defendant's previous criminal history and his "running from the police" and being a convicted felon in possession of the firearm that was used during the shootings, and that it was the Defendant's ultimate decision whether to testify. Counsel and the Defendant discussed that if the Defendant testified, he would have admitted to possessing a firearm and to being a convicted felon. Counsel offered to meet with the Defendant at the jail just before the trial began to discuss whether the Defendant should testify but that the Defendant said counsel did not need to come to the jail. Counsel believed that the Defendant had already decided he did not want to testify at the trial.

The trial transcript reflects that during the *Momon* colloquy, the Defendant stated under oath that he understood that it was solely his decision whether to testify and that he would be subject to cross-examination if he chose to testify. The Defendant stated he and trial counsel had discussed the advantages and disadvantages of testifying, and he understood that the prosecutor could question him about his previous criminal history and topics that "could be incriminating." The Defendant said he decided not to testify after he and counsel discussed the advantages and disadvantages of testifying. The record does not preponderate against the trial court's determination that the Defendant failed to establish counsel provided deficient performance resulting in prejudice. The Defendant is not entitled to relief on this basis.

## 4.       Trial Counsel's Alleged Failure to Present Defense Witnesses

The Defendant asserts that the trial court erred by denying relief on his ineffective assistance of counsel claim that trial counsel failed to present Mr. Chunn and Ms. Roach as defense witnesses. He asserts that the video recordings of Mr. Chunn implicated Mr. Barnhill, at least in part, in the shootings and that the photograph taken by Ms. Roach of the Defendant's injuries supported a potential self-defense theory. Trial counsel testified that Mr. Chunn could not be located before the jury began deliberations and that although Mr. Chunn stated in the recording that Mr. Humphrey shot Mr. Barnhill, Mr. Chunn did not exonerate the Defendant of the offenses. Counsel testified, as well, that he decided not to present Ms. Roach as a defense witness after the original trial judge, in the presence of the jury, chastised and admonished Ms. Roach about her cell phone usage and accused Ms. Roach of talking about the trial evidence. Counsel believed that presenting Ms. Roach as a witness would "open a lot of can of worms" and would not "look real good."

However, the trial transcript reflects that the original trial judge's discussion with Ms. Roach about her cell phone usage in the courtroom occurred outside the presence of the jury.[11] The record reflects that on the second day of the trial, the judge questioned Ms. Roach, who was placed under oath, about whether trial counsel told Ms. Roach the previous day that she could not return to the courtroom with her cell phone. Ms. Roach said that she did not remember being told that she could not return to the courtroom with her cell phone but recalled that she would have to give her phone to the court officer while she remained in the courtroom. Upon questioning by the judge, trial counsel stated that he told Ms. Roach the previous day not to return to the courtroom with her cell phone. The judge asked if Ms. Roach was "impaired in some way," and she responded that her memory was poor. Ms. Roach said she offered to give her phone to "him" upon entering the courtroom, and the judge explained that Ms. Roach could not return to the courtroom with her cell phone. Ms. Roach turned off her phone and agreed to give it to the judge, who asked if Ms. Roach had erased anything from the phone that she "might have sent out of here" the previous day. Ms. Roach said that she did not record the proceedings but that she viewed Facebook and other applications while inside the courtroom. Ms. Roach denied posting anything to Facebook about the trial. The judge stated, "I hope your attitude improves as the Judge is asking you questions," and Ms. Roach responded, "Well, I don't appreciate the way I am being spoken to and the words you are using and the way you are talking to me." The judge stated that she did not believe Ms. Roach did not recall being told not to return with her cell phone. The judge said, "I don't like her hostile attitude. You leave and don't come back." The record reflects that Ms. Roach left the courtroom and did not return. Based upon this evidence, we conclude that trial counsel's testimony that this exchange occurred

---

[11] The trial transcript reflects her name as Kelly Roche. We use the spelling reflected in the motion for new trial hearing transcript for consistency.

in the presence of the jury is contrary to the record and that the record preponderates against the trial court's finding that the exchange occurred in the presence of the jury.

In any event, the original trial judge told Ms. Roach to leave and not to return to the courtroom. Based upon their interaction, regardless of the fact that it occurred outside the jury's presence, trial counsel concluded that presenting Ms. Roach as a defense witness could have been more detrimental than beneficial to the defense. This conclusion was not unreasonable based upon the record before this court, and, as a result, counsel made a reasonable strategic decision not to present Ms. Roach as a trial witness. *See Adkins*, 911 S.W.2d at 347; *see also Pylant*, 263 S.W.3d at 874.

However, the Defendant cannot establish his ineffective assistance allegation because he did not present Mr. Chunn and Ms. Roach as witnesses at the motion for new trial hearing. This court will not speculate about the nature of any witness testimony that was not presented at the evidentiary hearing. *See Black*, 794 S.W.2d at 757. Furthermore, evidence that the Defendant was involved in a physical altercation with Mr. Barnhill and that the codefendant used a stun gun to end the "melee" against the Defendant was presented to the jury. As a result, the record does not preponderate against the trial court's determination that the Defendant failed to establish counsel provided deficient performance resulting in prejudice. The Defendant is not entitled to relief on this basis.

5.      **Trial Counsel's Alleged Failure to Meet with the Defendant More Than Once**

The Defendant asserts that the trial court erred by denying relief on his ineffective assistance of counsel claim that trial counsel failed to meet with him more than once to prepare for the trial. The Defendant testified that he and counsel met at the prison at which the Defendant was housed approximately eighteen days before the trial. The West Tennessee prison visitation logbook reflects that counsel and the Defendant met on February 18, 2022. Counsel signed the visitation logbook at 11:20 a.m. and signed out at 1:00 p.m. The Defendant said that counsel read five witness statements from the discovery materials, that counsel said the witnesses' "stories wouldn't match up," and that counsel said the Defendant did not need the discovery materials. The Defendant testified that although he and counsel were supposed to meet the weekend before the trial began, counsel did not come to the jail. The Defendant testified between February 18, 2022, which the Defendant said was their only in-person meeting, and February 26, 2022, which was the day he was transported to the jail for the trial, he and counsel spoke by telephone four times.

Trial counsel, however, provided inconsistent testimony regarding the number of times he and the Defendant had an in-person meeting. Initially, counsel testified that they met three or four times. Counsel referred to an early 2021 meeting, at which he took notes. The notes from a single meeting received as an exhibit were not dated but counsel later

testified that the meeting occurred at the courthouse. Counsel noted a meeting in West Tennessee in early January near the time of the trial, but the record reflects that the single prison meeting occurred on February 18, 2022. Counsel testified that although he intended to meet with the Defendant at the prison in January 2022, winter weather prevented him from traveling to the prison. Counsel likewise noted the February 18, 2022 prison meeting, and said they met for three or four hours, which is inconsistent with the prison visitation logbook. Counsel testified that around January 10, 2022, which the record reflects was the initial trial date before being continued due to a delay in the ballistics firearm report, the Defendant was transported to the jail and that they met at the courthouse. Counsel said they spoke by telephone ten to twelve times throughout his representation. Later, on cross-examination, counsel testified that he and the Defendant met in person twice, once in 2021 at the courthouse and once at the prison in February 2022. Then, counsel testified he and the Defendant met three times, but he later testified on recross-examination, that he and the Defendant met twice and spoke by telephone at various times.

The trial court noted the inconsistent testimony regarding the number of times the Defendant and trial counsel met to prepare for the trial. In rendering its credibility finding, the court found that regardless of the number of times they met to prepare for the trial, they only met for approximately three to four hours during counsel's representation. The record does not preponderate against this finding. *See Henley*, 960 S.W.2d at 578; *see Fields*, 40 S.W.3d at 456-57. The court determined that based upon the severity of the charges and the prolonged sentence of incarceration, counsel provided deficient performance in this regard.

However, the evidence of the Defendant's guilt was overwhelming. Multiple witnesses identified the Defendant as the shooter, and, at the time of his arrest, the Defendant possessed the firearm used during the shootings. The Defendant possessed a nine-millimeter handgun, and the ballistics firearm report reflected that the cartridge casings found at the scene were fired from the gun obtained from the Defendant. As a result, the record does not preponderate against the court's determination that the Defendant failed to establish that counsel's deficient performance resulted in prejudice. The Defendant is not entitled to relief on this basis.

## 6. Trial Counsel's Alleged Failure to Engage in Plea Negotiations

The Defendant asserts that the trial court erred by denying relief on his ineffective assistance of counsel claim that trial counsel failed to engage in plea negotiations with the prosecutor. At the evidentiary hearing, the Defendant testified that he and counsel never discussed a possible guilty plea but that, at the trial, he overheard a conversation between the prosecutor and counsel in which the prosecutor stated the prosecutor did not extend a plea offer because she did not think the defense would accept an offer. The Defendant did not testify about whether he would have accepted any potential plea offer, and this court

-36-

will not speculate. *See Black*, 794 S.W.2d at 757. Counsel's credited testimony in this regard reflects that he and the prosecutor generally discussed a possible plea agreement and that the prosecutor stated the Defendant would have to plead guilty as charged and agree to a twenty or twenty-five-year sentence. When counsel and the Defendant discussed a potential sentence of twenty to twenty-five years, the Defendant said he would not accept twenty to twenty-five years. Counsel recalled that the Defendant wanted a three- to six-year sentence in this case to be served concurrently with a previous three- or four-year sentence. Counsel explained to the Defendant that the prosecutor was not going to extend an offer "anything like that" and that the prosecutor might agree to a twenty- or twenty-five-year sentence. The record does not preponderate against the trial court's determination that the Defendant failed to establish counsel provided deficient performance resulting in prejudice. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

**s/Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE